UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT COURT OF OHIO
EASTERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                                 Case No. CR-2-08-124
                                              JUDGE GREGORY L. FROST

      v.

McCELLON MONTGOMERY,

      Defendant.

## ORDER

This matter came on for a hearing this 3rd day of October, 2008 upon Defendant's Motion to Suppress Evidence (Doc. # 16) filed on July 16, 2008 and upon the Government's Response (Doc. # 23) filed on July 21, 2008. Defendant maintains that all items retrieved from Defendant's shed and basement should be suppressed based on lack of consent. The Government submits that Defendant as well as his girlfriend gave consent to search the premises and that the evidence was lawfully seized.

**I. FACTS**

At the hearing, eight witnesses testified on behalf of the Government and four witnesses testified on behalf of Defendant. From the testimony provided and the exhibits admitted, the Court finds the facts to be as follows:

At 2:37 a.m. on July 14, 2007 Deputy Dan Malone, a Deputy Sheriff for the Scioto County Sheriff's Office, was dispatched to 2664 McCorkle Rockwell Road, Lucasville, Ohio to investigate a 911 call involving a shooting at that residence. He arrived at the residence at 2:51 a.m. As Deputy Malone began to search the premises he observed a man on the front porch who

1

indicated that he had been shot. The man was identified as McCellon Montgomery, the Defendant herein. Upon further questioning Deputy Malone was advised that Mr. Montgomery had gone onto his back porch for a breath of fresh air and he had been shot. As Mr. Montgomery attempted to re-enter the house, he was shot again. Deputy Malone observed buckshot wounds on Mr. Montgomery's back. Mr. Montgomery was upset but able to stand, walk, and communicate. He did not request assistance. Deputy Malone followed Mr. Montgomery inside the residence. The deputy observed a female, Joyce Ewing, inside the house.

Deputy Tony Crawford, another Scioto County Sheriff's Deputy, was dispatched to the scene and arrived at 2:59 a.m. Both Deputy Crawford and Deputy Malone began searching the perimeter of the residence for suspects and evidence. Nothing was found at that time. Five minutes later the medics who had been summoned were cleared to come onto the property. Mr. Montgomery was again questioned by the deputies. He had no trouble communicating with them. Mr. Montgomery told the deputies the same story that he had previously related and added that he had retrieved his .22 caliber pistol and had returned fire.

The deputies then turned their attention to the female. Ms. Ewing advised the deputies that she was Mr. Montgomery's girlfriend. She reported that she had been asleep on the couch and was awakened by the shots and her boyfriend's yells. After the initial questioning of Ms. Ewing, the deputies secured the scene by further searching the woods in back of the house. They found a black trash bag and bolt cutters. The black bag was found in the yard and the bolt cutters were found near a shed in the backyard. They observed that a lock on the shed was still intact. The evidence was left where they observed the items in order for the detectives to investigate.

In the meantime, Mr. Montgomery was examined by the medics. Jay Cropper, a volunteer paramedic, examined Mr. Montgomery. He examined the wounds and found some minor bleeding. Mr. Montgomery had no trouble breathing, no difficulty talking, and was able to walk on his own. The paramedic indicated that Mr. Montgomery appeared to be fine and was able to walk to the ambulance. The paramedics were not concerned about Mr. Montgomery being in any immediate distress. The ambulance left with Mr. Montgomery at 3:22 a.m. en route to the hospital and arrived at the hospital at 3:44 a.m. Upon arriving at the hospital, Mr. Montgomery was able to walk from the ambulance into the hospital without assistance and sign the report prepared by the paramedics.

After Mr. Montgomery was removed from the residence, Detective Blaine from the Scioto County Sheriff's Office arrived at the scene. He was advised by the deputies of what Mr. Montgomery had told them and what their investigation had revealed thus far. Detective Blaine and Deputy Crawford observed the shot patterns on the back porch and inside the kitchen. They also observed in the kitchen area marijuana residue, an ashtray with two marijuana cigarettes, rolling papers, and a baggie that contained a small amount of marijuana. While investigating the outside area, Detective Blaine noticed a water hose in the backyard that was still pressurized with water. He found that to be suspicious. Deputy Crawford heard a "humming" sound coming from the locked shed. Deputy Crawford smelled the odor of marijuana coming from the shed and suspected that a marijuana grow operation was being conducted inside the locked building.

At some point in time Lon Montgomery, Mr. Montgomery's son, arrived at the residence. Originally Detective Blaine thought that Lon Montgomery had been present during the shooting but after learning that he was there only to watch the house, Lon Montgomery was asked to

3

leave.

As previously stated, Mr. Montgomery arrived at the hospital at 3:44 a.m. and after being processed by Nickie Matney who worked in the emergency room, Jason Bennett, a registered nurse at the hospital began initial assessment and treatment. It appears from the records that the initial assessment and treatment began at 3:53 a.m. Nurse Bennett recalls that Mr. Montgomery had no trouble walking or breathing. There was no active bleeding at that time but the nurse noted many small pellets lodged in Mr. Montgomery's back. Although standard procedure required the insertion of a catheter, Mr. Montgomery refused it. The nurse did not question Mr. Montgomery's ability to make that decision and honored the refusal. Approximately ten minutes after the nurse began treating Mr. Montgomery, Captain John Murphy and Detective Denver Triggs arrived at the hospital to conduct an additional interview of Mr. Montgomery. The officers questioned Mr. Montgomery for approximately thirty minutes while he was being treated and being prepared to be transported to another hospital for further treatment. During this thirty minute interview, morphine was administered to reduce the pain. At least three times during the interview process, the nurse checked Mr. Montgomery and noted each time that Mr. Montgomery was alert and oriented to person, place, and time. The nurse testified that the morphine had no impact on Mr. Montgomery with regard to the manner in which he answered questions posed by the officers.

Captain Murphy and Detective Triggs were in constant contact with the officers at the residence. They were aware that bolt cutters had been found close to the shed and they surmised that the suspects had intended to cut the lock off of the outbuilding. They explained to Mr. Montgomery that they needed to search the outbuildings and the house for further evidence that

might identify who shot him or why the intruders were there at the residence. They asked Mr. Montgomery for consent to search the premises and he readily agreed. Mr. Montgomery advised the officers that the keys to the outbuilding were on a table in the residence. Captain Murphy indicated that during the entire conversation with Mr. Montgomery at the hospital and during the time that he gave consent to search the premises, Mr. Montgomery was alert, coherent, and responsive to the questions asked. Captain Murphy had no indication that Mr. Montgomery was under the influence of drugs or alcohol. The fact that Mr. Montgomery had consented to a search of the premises and the location of the keys were relayed to the officers at the scene.

Detective Matt Spencer had joined the other officers at the residence and was taking photographs of the scene. During that period of time, Detective Spencer also questioned Joyce Ewing, the girlfriend, about the outbuilding that was locked. She indicated to him that she was not allowed out to the shed. She told Detective Spencer that she lived at the residence for approximately one year. Although he had received information that Mr. Montgomery had given verbal consent to search the premises, Detective Spencer also asked Joyce Ewing to sign a written consent to search form. Detective Spencer explained the form to Ms. Ewing and advised her that they wanted to search the residence and the outbuildings. Detective Spencer testified that Ms. Ewing appeared to look at the forms and then she signed it and handed it to Detective Blaine who was also present.

Soon thereafter, Captain Murphy and Detective Triggs arrived at the residence. They attempted to locate the keys but they were not found. Detective Triggs was able to pick the lock on the outbuilding and inside they discovered a marijuana cultivation operation. A basement area under the house that was accessible only from the outside was also locked. Detective

5

Triggs again picked the lock and an additional marijuana cultivation operation was found there.

Mr. Montgomery was subsequently indicted on the charge of cultivation of marijuana plants and this motion to suppress was then filed.

The Court finds the facts to be as stated in this opinion. There were, however, three witnesses presented by Defendant who all recounted versions much different than the facts found by this Court. Burton Gorton, Joyce Ewing, and Stella Gorton presented testimony that contradicts the other testimony presented. This Court finds the testimony of Defendant's witnesses to be confusing, illogical, and the result of bias, prejudice or faulty memory related to the use of drugs, alcohol, or both.

Burton Gorton, the elderly step-father, of Joyce Ewing, testified that Joyce Ewing was not a resident of the premises where the shooting took place. Rather, he said that Joyce Ewing lived full time with he and Ms. Ewing's mother and simply stayed with Defendant as well as others on a sporadic basis. He characterized his step-daughter as a "total alcoholic" who would drink a case of beer per day. On the evening in question, Mr. Gorton testified that he drove Joyce Ewing to Defendant's residence because she did not have an operator's license. He remembers receiving a call from Joyce Ewing during the early morning hours of the next day. Ms. Ewing was at the hospital and stated that Defendant had been shot. He and his wife proceeded to the hospital where, as he remembered, Defendant was immobilized on a table and was "out of it." Mr. Gorton testified that he was laying there as if he were passed out. He also remembered that Joyce Ewing was drinking beer at the hospital. Mr. Gorton, Mrs. Gorton, and Joyce Ewing then drove to Mr. Montgomery's house to get his car to drive it to the hospital where Mr. Montgomery was being transferred. He recalled that Joyce Ewing had been drinking

that day and was intoxicated when he arrived at the hospital. He also recalled that when they arrived at the Montgomery residence, a pickup truck and trailer was already there. He did not go inside the house and remained in the car.

The problem with Mr. Gorton's testimony is that if the pickup truck and trailer were already at the Montgomery residence when he arrived with his wife and Joyce Ewing from the hospital, the time would have been well after Joyce Ewing had given consent to search the premises because the pickup truck and trailer were not summoned until the marijuana plants were confiscated and the truck and trailer were being used to transport the evidence to the Scioto County Sheriff's Office. Mr. Gorton's testimony contradicts that of the officers and Ms. Ewing's own testimony.

Joyce Ewing testified that she had smoked a marijuana cigarette with Mr. Montgomery on the evening of the shooting and she was intoxicated before as well as after the shooting. She said she rode with Mr. Montgomery in the ambulance to the hospital but there are no records that indicate that she was ever in the ambulance. She testified that she told the officers that she did not live at the Montgomery residence and that she signed the consent to search form when she returned from the hospital and the only reason she signed it was that the officers would not permit her to leave until she signed it. She testified that she was drinking beer during her encounters with the officers.

Ms. Ewing's testimony does not comport with the facts testified to by the officers and verified by various law enforcement logs. This Court finds her testimony to be incredible and confused. Based upon her own admissions concerning the use of alcohol and illegal drugs, this Court cannot give credence to her testimony.

7

Finally, Stella Gorton, the mother of Joyce Ewing, testified. She confirmed that her daughter was an alcoholic and had a "terrible drinking habit." Ms. Gorton's testimony mirrored much of the testimony provided by Joyce Ewing. Based upon verified time frames testified to by the officers and the fact that Ms. Ewing's testimony was unbelievable, this Court finds that, at best, Ms. Gorton was confused or, at worst, lied about the events of the evening.

**II. ANALYSIS**

The law on consent to search is well settled. The question of whether any consent to search was given voluntarily is a question of fact to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). The United States has the burden to establish by a preponderance of the evidence that the consent was given freely, voluntarily and was not coerced. *United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir.), *cert denied,* 519 U.S. 848 (1996); *United States v. Bueno*, 21 F.3d 120 (6th Cir. 1994).

Consent is voluntary when it is "unequivocal, specific, and intelligently given, uncontaminated by any duress or coercion". *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1980), *citing, United States v. McCaleb*, 552 F.2d 717, 721 (6th Cir. 1977). In deciding voluntariness, the Court should consider several factors:

> First, a court should examine the characteristics of the accused, including the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; and whether the individual understands his or her constitutional rights. Second, a court should consider the details of the detention, including the length and nature of the detention; the use of coercive or punishing conduct by the police, and indications of more subtle forms of coercion that might flaw an individual's judgment.

*Id.* The voluntariness of a consent to search is a question of fact. *United States v. Rose,* 889

F.2d 1490 (6th Cir. 1989)**.**

      In this case there is nothing that demonstrates that Defendant's age, intelligence, or education prevented him from understanding what was being asked of him or prevented him from giving consent to search the premises. The argument is that Defendant was in the hospital and sedated when the consent was given and it was not a voluntary consent and was not unequivocally or intelligently made. The facts support a different conclusion then that advanced by Defendant. Both officers at the hospital testified that Defendant was coherent and fully alert. Although Defendant was in some pain, the officers testified that Defendant responded appropriately to their questions and had no difficulty communicating with the officers or the hospital personnel. The nurse on duty honored Defendant's refusal to allow insertion of the catheter indicating to this Court that the nurse did not question Defendant's ability to make decisions. More importantly, during the thirty minutes interview that the officers had with Defendant he was checked constantly by the nurse and was found to be alert and oriented. The hospital records indicate that the officers arrived at 4:05 a.m. at which time the nurse noted that Defendant was alert and oriented to person, place, and time. Defendant was also checked at 4:19 a.m. and 4:27 a.m. Each time it was noted that Defendant was alert and oriented.

      In most cases, the Court is faced with the decision of evaluating the testimony of officers as to a defendant's awareness of the circumstances surrounding a consent. Seldom does the Court have the benefit of a registered nurse's testimony in that regard. Moreover, the testimony of the officers as well as the nurse was unrebutted by Defendant's witnesses or Defendant himself. None of Defendant's witnesses were in the hospital at the time Defendant gave consent.

      **III. CONCLUSION**

This Court finds from the reliable testimony provided that Defendant unequivocally, specifically, and intelligently provided voluntary consent to search the scene of the shooting including the residence and the outbuilding. Having reached this conclusion the Court need not and does not reach the issue of whether Joyce Ewing had apparent authority to give consent and whether, in fact, she did give consent. Accordingly, the Motion to Suppress Evidence (Doc. #16) is overruled and the same is **DENIED**.

**IT IS SO ORDERED**.

                                            s/ Gregory L. Frost
                                            GREGORY L. FROST
                                            UNITED STATES DISTRICT JUDGE